**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEXIS HERNANDEZ AVILEZ, *Petitioner-Appellee,* | No. 20-16142 |
| v. | D.C. No. 3:19-cv-08296-CRB |
| MERRICK B. GARLAND, Attorney General; ALEJANDRO N. MAYORKAS, in his official capacity; TAE D. JOHNSON, in his official capacity; DAVID W. JENNINGS, *Respondents-Appellants,* | ORDER AND AMENDED OPINION |
| and | |
| WENDELL ANDERSON, in his official capacity, *Respondent.* | |

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted October 22, 2021
San Francisco, California

Filed September 8, 2022
Amended June 6, 2023

Before: Mary H. Murguia, Chief Judge, and Marsha S.
Berzon and Carlos T. Bea, Circuit Judges.

Order;
Opinion by Chief Judge Murguia;
Concurrence by Judge Berzon;
Concurrence by Judge Bea

## SUMMARY[*]

### Habeas/Immigration

The panel filed: (1) an order amending the opinion filed on September 8, 2022, and published at 48 F.4th 915 (9th Cir. 2022), denying on behalf of the court a petition for rehearing en banc, and indicating that no further petitions for rehearing en banc would be entertained; and (2) an amended opinion vacating the district court's grant of habeas relief and remanding in a case in which Lexis Hernandez Avilez challenged her immigration detention.

In the amended opinion, the panel held that a noncitizen of the United States—who initially was subject to mandatory detention under 8 U.S.C. § 1226(c)—is not entitled to a bond hearing under 8 U.S.C. § 1226(a) while awaiting a decision from this court on a petition for review.

Hernandez Avilez petitioned for habeas relief after being in immigration detention for over a year without a bond

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

hearing. During her initial removal proceedings, she was subject to mandatory detention under 8 U.S.C. § 1226(c) ("Subsection C") due to a conviction. Thus, she was not statutorily entitled to a bond hearing. However, in *Casas-Castrillon v. Department of Homeland Security*, 535 F.3d 942 (9th Cir. 2008), this court held that once a noncitizen's immigration case reaches judicial review, the authority for holding a Subsection C detainee shifts to 8 U.S.C. § 1226(a) ("Subsection A"), which does entitle a noncitizen to a bond hearing. Accordingly, Hernandez Avilez argued she was entitled to a bond hearing because she had filed a petition for review. The Government conceded that Hernandez Avilez would be entitled to a bond hearing under *Casas-Castrillon*, but argued that *Casas-Castrillon* is clearly irreconcilable with *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018). The district court rejected that contention and ordered the Government to provide Hernandez Avilez a bond hearing.

Under *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc), a three-judge panel may depart from circuit precedent only if the precedent is clearly irreconcilable with the reasoning or theory of intervening higher authority. Here, the panel observed that the Supreme Court's decision in *Jennings* does not directly address the question in *Casas-Castrillon*—when, if ever, mandatory detention under Subsection C ends. However, the panel explained that *Jennings*'s reasoning makes clear that Subsection A and Subsection C apply to discrete categories of noncitizens, and not to different stages of a noncitizen's legal proceedings. Thus, if a noncitizen is initially detained under Subsection C, the authority to detain her cannot switch to Subsection A based on the stage of her case. Accordingly, the panel concluded that *Jennings*'s reasoning is "clearly irreconcilable" with *Casas-Castrillon*'s detention-shifting

framework and held that *Jennings* abrogated this portion of *Casas-Castrillon*.

Next, the panel explained that Subsection A provides the Government with authority to detain noncitizens "pending a decision on whether the alien is to be removed from the United States," and that *Jennings* provides that Subsection C authorizes detention during the same period as Subsection A, but does not define that period. The panel looked to *Prieto-Romero v. Clark*, 534 F.3d 1053 (9th Cir. 2008), which was decided by the same panel on the same day as *Casas-Castrillon*, and held that detention authority under Subsection A continues through judicial review. Explaining that it is clear after *Jennings* that the time period defined by Subsection A applies to Subsection C as well, the panel held that the authority under Subsection C likewise continues through judicial review.

The panel recognized that there are reasons to doubt whether Subsection C extends to the judicial phase of removal proceedings. First, the panel observed that in *Demore v. Kim*, 538 U.S. 510 (2003), the Supreme Court plainly assumed that detention under Subsection C applies solely to the administrative phase of removal proceedings. Second, the panel explained that *Jennings* referred to *Demore*'s understanding of the scope of Subsection C, and *Demore* assumed that authority under Subsection C ended with the administrative phase. Noting that *Prieto-Romero* is in some tension with *Demore*, the panel explained that neither *Demore* nor *Jennings* squarely addressed the question and, accordingly, *Prieto-Romero* remains good law on this point.

The panel observed that the issue presented to this court on appeal by the Government as appellant was limited to

whether Subsection A or Subsection C of Section 1226 applied during the relevant time period. Because neither party raised any argument that 8 U.S.C. § 1231(a) applied—whether because the stay in this case was a temporary stay, or for any other reason—the panel did not consider that possibility.

Finally, the district court declined to reach Hernandez Avilez's alternative argument that she was entitled to habeas relief as a matter of due process. The panel remanded to the district court to consider this question in the first instance.

Concurring, Judge Berzon wrote separately to express her disquiet with the partial abrogation *Miller v. Gammie* compelled in this case, and to urge her colleagues to consider rehearing this case en banc. According to Judge Berzon, the result of the holding in this case was to save fragments of two opinions that were cohesively crafted—*Prieto-Romero* and *Casas-Castrillon*—to fashion an entirely new interpretation of the statutory scheme that technically holds together, but diverges dramatically from this Court's original interpretation. Judge Berzon wrote that sitting en banc, the court could consider whether the shared endpoint for Subsection A and Subsection C is the end of administrative proceedings, not the end of judicial review.

Concurring, Judge Bea wrote that he concurred in the principal opinion, with two exceptions. First, Judge Bea wrote that there is not any meaningful "tension" between the holdings of *Demore*, *Jennings*, and *Prieto-Romero* with respect to the meaning of "pending a decision on whether the alien is to be removed from the United States," 8 U.S.C. § 1226(a). Judge Bea wrote that *Demore* did not "plainly assume" that detention authority under § 1226(c) extended only to the administrative phase of removal proceedings, and

*Jennings* did not further endorse this (alleged) understanding of § 1226(c). Second, Judge Bea rejected the principal opinion's use of the non-statutory word "noncitizen" to characterize Petitioner rather than the statutory term "alien."

## COUNSEL

Sarah S. Wilson (argued), Senior Litigation Counsel; Ernesto Molina, Deputy Director, Office of Immigration Litigation; Brian Boynton, Acting Assistant Attorney General, Civil Division; United States Department of Justice; Washington, D.C.; for Respondents-Appellants.

Judah Lakin (argued) and Amalia Wille, Lakin & Wille LLP, Oakland, California; Hector A. Vega and Genna Ellis Beier, San Francisco Public Defender's Office, San Francisco, California; for Petitioner-Appellee.

## ORDER

The Opinion filed September 8, 2022, and published at 48 F.4th 915 (9th Cir. 2022), is hereby amended. An amended opinion is filed herewith.

The full court has been advised of the suggestion for rehearing en banc, and no judge has requested a vote. Fed. R. App. P. 35. The petition for rehearing en banc is **DENIED** (Doc. 55). No further petitions for rehearing or rehearing en banc will be entertained.

## OPINION

MURGUIA, Chief Circuit Judge:

Lexis Hernandez Avilez, a Mexican citizen, petitioned for habeas relief after being held in immigration detention for over a year without a bond hearing. A district court judge granted Hernandez Avilez's petition for relief and ordered the Government to provide her with a bond hearing on statutory grounds, relying on *Casas-Castrillon v. Department of Homeland Security*, 535 F.3d 942 (9th Cir. 2008). The Government appealed on the ground that *Casas-Castrillon* is no longer good law. For the following reasons, we vacate the district court's grant of habeas relief and remand for consideration of Hernandez Avilez's remaining constitutional argument.

## I.

Lexis Hernandez Avilez has lived in the United States since infancy and became a lawful permanent resident in 2000. In 2006, Hernandez Avilez was convicted of assault with a firearm in violation of California Penal Code § 245(a)(2). She was sentenced to sixteen years in prison, including a ten-year enhancement for gang participation. California authorities notified Immigration and Customs Enforcement ("ICE") of Hernandez Avilez's pending parole in late 2018.

Upon release from state prison in November 2018, Hernandez Avilez was immediately taken into ICE custody, served with a Notice to Appear, and placed in removal proceedings based on her felony assault conviction pursuant to Immigration & Nationality Act § 237(a)(2)(A)(iii), codified at 8 U.S.C. § 1227(a)(2)(A)(iii). The parties agree

that during Hernandez Avilez's initial removal proceedings, she initially was subject to mandatory immigration detention under 8 U.S.C. § 1226(c) ("Subsection C") because of her prior conviction.    Under Subsection C, detention is mandatory, and a noncitizen of the United States ("noncitizen") therefore is not statutorily entitled to a bond hearing.[1]

During removal proceedings, Hernandez Avilez conceded removability based on her criminal conviction. She sought relief, however, under the Convention Against

---

[1] This opinion uses the term noncitizen unless quoting language from the immigration statutes or past opinions containing the term alien.  There are two reasons behind this choice.  First, use of the term noncitizen has become a common practice of the Supreme Court, *see Patel v. Garland*, 142 S. Ct. 1614, 1618 (2022) (Barrett, J.); *United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1619 (2021) (Sotomayor, J.); *Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (Kavanaugh, J.) ("This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'" (citing 8 U.S.C. § 1101(a)(3)), whose lead on matters of style we ordinarily follow, and of the Board of Immigration Appeals, *e.g.*, *Matter of Dang*, 28 I. & N. Dec. 541, 543 (BIA 2022), whose decisions we review.  Second, even if that were not the case, "[c]areful writers avoid language that reasonable readers might find offensive or distracting—unless the biased language is central to the meaning of the writing." *Chicago Manual of Style Online* 5.253, https://www.chicagomanualofst yle.org/book/ed17/part2/ch05/psec253.html.    The word alien can suggest "strange," "different," "repugnant," "hostile," and "opposed," *Alien*, *Webster's Third New International Dictionary* 53 (2002), while the word noncitizen, which is synonymous, *see Alien* and *Noncitizen*, *American Heritage Dictionary of English Language* 44, 1198 (5th ed. 2011), avoids such connotations.  Thus, noncitizen seems the better choice.  Respectfully, we do not see how this choice "comes at a real cost to litigants." Judge Bea Concurrence at 44.  Litigants may use either word, and we do not think our choice here will cause judges to "respond negatively" to litigants who use the term alien.  *See* Judge Bea Concurrence at 44.

Torture ("CAT"), which allows a noncitizen to remain in the United States if she can show that she is more likely than not to be tortured if returned to her home country.  In March 2019, an immigration judge ("IJ") denied CAT relief and ordered Hernandez Avilez removed to Mexico.  In August 2019, after Hernandez Avilez's timely appeal of the IJ's denial of CAT relief, the Board of Immigration Appeals ("BIA") dismissed Hernandez Avilez's appeal.  Hernandez Avilez then petitioned this court for review of the BIA's decision and sought a stay of removal.[2]  *See Hernandez Avilez v. Garland*, No. 19-72040, Dkt. No. 8 (9th Cir. Aug. 26, 2019).   Several months later, in November 2019, Hernandez Avilez filed a motion to reopen her immigration proceedings before the BIA, based on new evidence of her gender transition and the risks she would face as a transgender woman in Mexico.[3]

---

[2] "Upon the filing of an initial motion or request for stay of removal or deportation, the order of removal or deportation is temporarily stayed until further order of the Court."  Ninth Circuit General Order 6.4(c)(1).

[3] We have discretion to take judicial notice of documents "not subject to reasonable dispute."  Fed. R. Evid. 201(b).  And we "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011) (quoting *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992)).   Accordingly, we grant Hernandez Avilez's motion to take judicial notice of documents clarifying the status of her immigration case and related Ninth Circuit petition for review.

In August 2021, the BIA granted Hernandez Avilez's motion to reopen. As a result, Hernandez Avilez filed a motion to voluntarily dismiss her petition for review, and on September 22, 2021, we granted her motion. Her reopened removal proceedings remain pending before the immigration court.

In December 2019, after spending more than a year in immigration detention, Hernandez Avilez filed a petition for habeas corpus under 28 U.S.C. § 2241 in the U.S. District Court for the Northern District of California. In her habeas petition, Hernandez Avilez argued that under *Casas-Castrillon*, she no longer was subject to mandatory detention under Subsection C because her removal order was judicially stayed pending a decision on her petition for review of the agency's denial of CAT relief. *Casas-Castrillon* held that once a noncitizen's immigration case reaches judicial review, that noncitizen is detained under 8 U.S.C. § 1226(a) ("Subsection A")—the general, discretionary administrative detention provision for noncitizens in removal proceedings—not Subsection C, which applies to noncitizens in removal proceedings who have been convicted of certain criminal offenses. Hernandez Avilez further maintained that because Subsection A requires that noncitizens receive a bond hearing, she now was entitled to a bond hearing. Finally, Hernandez Avilez also argued that her prolonged detention violated due process.[4]

The Government conceded that under *Casas-Castrillon*, Hernandez Avilez would have been entitled to a bond hearing under Subsection A while her petition for review was pending in this court. The Government argued, however, that *Casas-Castrillon* was inapplicable because it was "clearly irreconcilable" with intervening Supreme Court authority—specifically, *Jennings*. In the Government's view, under *Jennings*, a noncitizen who has been convicted

---

[4] Hernandez Avilez, who is transgender, also argued that her detention violated substantive due process because ICE refused to provide her with gender-affirming care. The district court dismissed this claim after Hernandez Avilez began receiving such care. Hernandez Avilez's substantive due process claim is not at issue on appeal.

of a qualifying crime and who initially is detained under Subsection C, remains detained under Subsection C throughout agency removal proceedings and any subsequent judicial review.  This argument is contrary to *Casas-Castrillon*'s holding that a Subsection C detainee's detention shifts to Subsection A after the administrative phase of removal proceedings end and the judicial phase begins.  The Government argues that as a result of *Jennings*, Hernandez Avilez remained detained under Subsection C and so, was never statutorily entitled to a bond hearing.

The district court concluded that *Casas-Castrillon* remained good law; that, because Hernandez Avilez had filed a petition for review, her detention fell under Subsection A; that she thus no longer was subject to mandatory detention; and that the Government therefore was required to provide her a bond hearing.  An IJ subsequently held a hearing and granted Hernandez Avilez bond in the amount of $10,000.[5]  Hernandez Avilez posted bond and is no longer in custody.  The Government timely appealed the district court's order, again arguing that *Casas-Castrillon* is "clearly irreconcilable" with *Jennings* and that Hernandez Avilez therefore was not entitled to a bond hearing.

The question before us on appeal is whether the Supreme Court's decision in *Jennings* abrogated our circuit's precedent in *Casas-Castrillon*, thereby precluding noncitizens like Hernandez Avilez—who initially were detained under Subsection C based on a prior, qualifying criminal conviction—from receiving a bond hearing under Subsection A while awaiting a decision from this court on a petition for review.

---

[5] By the time of the bond hearing, Hernandez Avilez had been detained for seventeen months.

## II.

We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a).  We review de novo a district court's order granting a petition for a writ of habeas corpus under 28 U.S.C. § 2241. *Diouf v. Mukasey*, 542 F.3d 1222, 1228 (9th Cir. 2008).

### A.

Noncitizens in the United States are removable if they fall within any of several statutory classes of removable individuals, one of which is noncitizens convicted of certain enumerated criminal offenses. *See* 8 U.S.C. § 1227(a).  Four statutes grant the Government[6] authority to detain noncitizens who have been placed in removal proceedings: 8 U.S.C. §§ 1225(b) ("Section 1225(b)"), 1226(a) ("Subsection A"), 1226(c) ("Subsection C"), and 1231(a) ("Section 1231(a)").[7]  A noncitizen's place "within this statutory scheme can affect whether his detention is mandatory or discretionary, as well as the kind of review process available to him if he wishes to contest the necessity of his detention."  *Prieto-Romero v. Clark*, 534 F.3d 1053,

---

[6] Although these statutes refer to the Attorney General's authority to detain noncitizens in immigration proceedings, the statutes predate the creation of the Department of Homeland Security.  This authority now resides with the Secretary of Homeland Security.  *See* 6 U.S.C. § 251(2).

[7] Section 1225(b) grants the Government authority to detain noncitizens who arrive or are present in the United States but who "ha[ve] not been admitted."  8 U.S.C. § 1225(b); *see also Jennings*, 138 S. Ct. at 836–37 (describing the subsection's scope).  Although Section 1225(b) is an important part of Congress's detention scheme, this opinion concerns only "admitted" noncitizens.  Accordingly, any reference to noncitizens in this opinion refers only to individuals who have been "admitted" to the United States—and the detention statutes which authorize their detention—not applicants for admission.

1057 (9th Cir. 2008).  Only Subsection A and Subsection C are directly at issue in this case.

Subsection A is the default detention statute for noncitizens in removal proceedings and applies to noncitizens "[e]xcept as provided in [Subsection C]."  8 U.S.C. § 1226(a).**[8]**  Subsection A states that "[o]n a warrant

---

[8] Section 1226(a) and (b) state:

**(a) Arrest, detention, and release**

On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States.  Except as provided in subsection (c) and pending such decision, the Attorney General—

**(1)** may continue to detain the arrested alien; and

**(2)** may release the alien on—

**(A)** bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

**(B)** conditional parole; but

**(3)** may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

**(b) Revocation of bond or parole**

The Attorney General at any time may revoke a bond or parole authorized under subsection (a),

issued by the Attorney General, an alien *may* be arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id.* (emphasis added). The statute also provides for release on bond or conditional parole. *Id.* at § 1226(a)(2). Because of Subsection A's permissive language—specifically, the word "may"— detention under Subsection A is discretionary. *See Prieto-Romero*, 534 F.3d at 1059.

Subsection C provides for the detention of "criminal aliens" and states that "[t]he Attorney General *shall* take into custody any alien who" is deportable or inadmissible based on a qualifying, enumerated offense. 8 U.S.C. § 1226(c) (emphasis added).[9] Release under Subsection C is limited to

---

rearrest the alien under the original warrant, and detain the alien.

8 U.S.C. § 1226(a)–(b).

[9] Section 1226(c) states:

**(c) Detention of criminal aliens**

**(1) Custody**

The Attorney General shall take into custody any alien who—

**(A)** is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

**(B)** is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

**(C)** is deportable under section 1227(a)(2)(A)(i) of this title on the basis

certain witness protection purposes.  *See id.* at § 1226(c)(2). Because of its use of the word "shall," detention under Subsection C is mandatory.  *See Jennings*, 138 S. Ct. at 847.

---

of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or

**(D)** is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

**(2) Release**

The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.  A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

8 U.S.C. § 1226(c).

The differences in the discretionary or mandatory language of Subsections A and C respectively have significant consequences. Under Subsection A—the default detention provision—a noncitizen is entitled to a bond hearing at which the IJ considers whether the noncitizen is a flight risk or a danger to the community. *See Jennings*, 138 S. Ct. at 847 ("Federal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention. *See* 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1)."); *see also Singh v. Holder*, 638 F.3d 1196, 1205 (9th Cir. 2011). By contrast, under Subsection C, which applies to noncitizens convicted of certain crimes, a noncitizen is not statutorily entitled to a bond hearing. *See Jennings*, 138 S. Ct. 846–47.

Finally, Section 1231(a) applies to detention after the entry of a final order of removal. In contrast to Subsections A and C, Section 1231(a) does not apply to detention during the pendency of administrative or judicial removal proceedings. Section 1231 instead governs detention during a ninety-day "removal period" after the conclusion of removal proceedings.[10] *Id.* § 1231(a)(1)–(2). This "removal period" begins on the latest of either (1) the date a noncitizen's "order of removal becomes administratively final," (2) the date of a court's final order, if the noncitizen's

---

[10] After the 90-day period, the Government may continue detaining noncitizens under Section 1231(a) for "a period reasonably necessary to secure removal." *See Zadvydas v. Davis*, 533 U.S. 678, 699–701 (2001) (holding that the Government's detention authority under Section 1231(a) is authorized for "a period reasonably necessary to secure removal"); *cf. Johnson v. Arteaga-Martinez*, No. 19-896, 2022 WL 2111342 (U.S. June 13, 2022) (holding that § 1231(a)(6) cannot be read to require a bond hearing after six months of detention but that the text of the statute gives the Government discretion to provide bond hearings).

removal order is judicially reviewed and this court stays the noncitizen's removal, or (3) the date the noncitizen is released from criminal detention or confinement. *Id.* § 1231(a)(1)(B)(i)–(iii).

In 2008, this court addressed the interplay between these three detention provisions in two opinions published by the same panel on the same day: *Prieto-Romero v. Clark*, and *Casas-Castrillon v. Department of Homeland Security*.

*Prieto-Romero* interpreted the language in Subsection A authorizing the Government to detain noncitizens "pending a decision on whether [they are] to be removed from the United States." *See* 8 U.S.C. § 1226(a); *Prieto-Romero*, 534 F.3d at 1062. We held that "it is reasonable to consider the judicial review of a removal order as part of the process of making an ultimate 'decision' as to whether an alien 'is to be removed.'"[11] *Id.* Accordingly, we held that Subsection A grants the Attorney General authority to detain a noncitizen throughout the administrative *and* judicial phases of removal proceedings. Detention authority under Subsection A ends, we went on, only when this court or the Supreme Court "enter[s] a final order denying [the noncitizen's] petition for review." *Id.*

*Casas-Castrillon* incorporated this understanding of Subsection A in its holding and involved facts very similar to those of the case at bar. Luis Felipe Casas-Castrillon was a legal permanent resident who had been convicted of crimes of moral turpitude under § 1227(a)(2)(A)(ii). *Casas-*

---

[11] Because Prieto-Romero had filed a petition for review and we had entered a stay of removal, we concluded that he was detained under Subsection A. *Prieto-Romero*, 534 F.3d at 1062. We further explained that, if we denied the petition for review, Prieto-Romero's detention would shift from Subsection A to Section 1231(a). *Id.*

*Castrillon*, 535 F.3d at 945. Following Casas-Castrillon's release from state incarceration, he was placed in removal proceedings and detained pursuant to Subsection C. *Id.* at 944. In July 2002, the BIA affirmed an IJ's decision ordering Casas-Castrillon removed from the United States. *Id.* at 945.

From July 2002 through July 2008, Casas-Castrillon sought relief from removal in the federal courts. *Id.* For most of that period, a federal court had stayed his removal, but Casas-Castrillon remained in immigration detention. *Id.* Then, in August 2005, Casas-Castrillon filed a petition for habeas corpus arguing that his detention had become indefinite and that his prolonged detention without a bond hearing violated his right to procedural due process. *Id.*

In *Casas-Castrillon*, we reversed the district court's order denying habeas relief on the ground that the source of the Government's authority to detain Casas-Castrillon had shifted from Subsection C to Subsection A when the administrative phase of his removal proceedings ended— that is, upon the BIA's decision. We reached that conclusion by process of elimination as follows: First, we determined that Section 1231(a) was inapplicable to Casas-Castrillon because none of Section 1231(a)(1)(B)'s conditions had been met—hence, the "removal period" had not begun. *Id.* at 947. We explained that when a noncitizen "file[s] a petition for review with this court and receive[s] a judicial stay of removal," the Government's detention authority under Section 1231(a) does not begin until judicial review concludes with a court order and the stay is lifted. *Id.*; *see also Prieto-Romero*, 534 F.3d at 1062. Casas-Castrillon could not have been detained under Section 1231 because his removal order remained judicially stayed pending judicial review. *Casas-Castrillon*, 535 F.3d at 947.

Next, we concluded that Casas-Castrillon was not detained pursuant to Subsection C. *Id.* We relied on three sources of authority to conclude that Subsection C authority ends with the BIA's dismissal of an appeal. First, we looked to *Tijani v. Willis*, 430 F.3d 1241, 1242 (9th Cir. 2005), which used the canon of constitutional avoidance to hold that Subsection C "applies only to 'expedited removal of criminal aliens.'" *Id.* Hernandez Avilez acknowledges that *Tijani*'s language and interpretation of Subsection C is now foreclosed by *Jennings*. Second, we noted the Supreme Court's observation in *Demore v. Kim*, 538 U.S. 510 (2003), that:

> [Subsection C] was intended only to "govern[] detention of deportable criminal aliens *pending their removal proceedings*," which the Court emphasized typically "lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal" his removal order to the BIA.

*Casas-Castrillon*, 535 F.3d at 948. Finally, we pointed to Department of Homeland Security regulations that supported interpreting Subsection C as applying only until the BIA dismisses the noncitizen's appeal. *Id.* (citing 8 C.F.R. §§ 236.1(c)(1)(i) and 1241.1(a)–(c)).

*Casas-Castrillon* concluded that "[b]ecause neither [Subsection A] nor [Subsection C] governs the prolonged detention of aliens awaiting judicial review of their removal orders," the detention of noncitizens initially detained under Subsection C "was authorized during this period under the

Attorney General's general, discretionary detention authority under [Subsection A]." *Id.* In other words, once Casas-Castrillon sought review in the federal courts and received a judicial stay of removal, the Government's detention authority shifted to Subsection A. *Id.* at 948.

So, pursuant to *Casas-Castrillon*, the statutory regime authorizing detention of a noncitizen initially detained under Subsection C operated as follows: Once the BIA affirmed a final order of removal for a noncitizen detained under Subsection C, the Government's detention authority shifted either to Section 1231(a), or if the noncitizen filed a petition for review in federal court and received a stay of removal, to Subsection A. *See id.* at 946–48. This shift relied on *Prieto-Romero*'s holding that Subsection A, which refers to detention "pending a decision on whether the alien is to be removed from the United States," applies not only during administrative removal proceedings, but also during judicial review. *Id.* at 948.

Finally, because *Casas-Castrillon* concluded that prolonged detention without an individualized determination "would be 'constitutionally doubtful,'" it interpreted Subsection A to *require* a bond hearing. *Id.* at 951 (quoting *Tijani*, 430 F.3d at 1242). And because Casas-Castrillon was detained under Subsection A, he was entitled to a bond hearing to determine his dangerousness or risk of flight. *Id.*

## B.

In *Jennings v. Rodriguez*, the Supreme Court reversed this court's holding in *Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015)—which had interpreted various immigration detention statutes. *See* 138 S. Ct. at 836. Our decision in *Rodriguez* held that Subsection C included "an implicit 6-month time limit on the length of mandatory detention." *Id.*

at 846.  The Supreme Court rejected that interpretation of Subsection C.  *Id.* at 836, 838.  The Court noted that Subsection C "does not on its face limit the length of the detention it authorizes."  *Id.* at 846.  Rather, "subject only to express exceptions, . . . [Subsection C] authorize[s] detention until the *end of applicable proceedings*."  *Id.* at 842 (emphasis added).  The Court explained that Subsection C clearly "mandates detention" for the time period laid out in Subsection A: "pending a decision on whether the alien is to be removed from the United States."  *See* 8 U.S.C. § 1226(a); *Jennings*, 138 S. Ct. at 846.  The Court therefore concluded that Subsection C "mandates detention of any alien falling within its scope and that detention may end prior to the conclusion of removal proceedings 'only if' the alien is released for witness-protection purposes."  *Jennings*, 138 S. Ct. at 847.

In addition, the Supreme Court acknowledged that Subsection A authorizes a noncitizen's release on bond but held that "there [was] no justification for any of the procedural requirements that the Court of Appeals layered onto [Subsection A] without any arguable statutory foundation."  *Id.* at 842.  The Court, therefore, reversed this court's statutory holdings and remanded for consideration of the noncitizens' constitutional argument that regardless of the statutory language, prolonged detention without a bond hearing violates due process.  *Id.* at 851.**[12]**

The question before us is whether *Jennings* abrogated *Casas-Castrillon*'s holding that, with respect to noncitizens subject to detention under Subsection C, detention authority

---

[12] This court subsequently remanded those constitutional questions to the district court.  *Rodriguez v. Marin*, 909 F.3d 252, 255–56 (9th Cir. 2018).

shifts from Subsection C to Subsection A during the judicial phase of removal proceedings.  A three-judge panel may depart from circuit precedent only if "our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).  "[T]he 'clearly irreconcilable' requirement 'is a high standard.'"  *FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1213 (9th Cir. 2019) (quoting *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013)).  "[I]f we can apply our precedent consistently with that of the higher authority, we must do so."  *Id.*

The holding of *Jennings* does not directly address the question considered in *Casas-Castrillon*—when, if ever, mandatory detention under Subsection C ends.  But *Jennings*'s reasoning regarding § 1226 makes clear that Subsection A and Subsection C apply to discrete categories of noncitizens—and *not* to different stages of a noncitizen's legal proceedings.  That is, whatever the phrase "pending a decision on whether the alien is to be removed' means, *see* 8 U.S.C. § 1226(a), it applies to Subsection C as well as to Subsection A.  Thus, if a noncitizen is initially detained under Subsection C, the Government's authority to detain her cannot switch to Subsection A based on the stage of her legal case.  *Jennings*'s reasoning that Subsection A and Subsection C apply during the *same* stages of removal proceedings is "clearly irreconcilable" with *Casas-Castrillon*'s detention-shifting framework, which transforms a noncitizen's detention under Subsection C into detention under Subsection A based on the procedural posture of the noncitizen's immigration case.

More specifically, in *Jennings*, the Court emphasized that "§ 1226 distinguishes between *two different categories*

of aliens." 138 S. Ct. at 837 (emphasis added).  It explained that Subsection A "creates a default rule . . . by permitting—but not requiring—the Attorney General to issue warrants for [a noncitizen's] arrest and detention pending removal proceedings." *Id.* at 846.  Subsection C, in contrast, states that covered criminal noncitizens "shall" initially be detained, and although Subsection A permits noncitizens to be released on bond, *Jennings* was emphatic that the release provision does not apply to Subsection C.  *Id.*  The Court in *Jennings* stressed that, under the language in the statute, noncitizens detained under Subsection C may be released on bond only if "doing so is necessary for witness-protection purposes and . . . [they] will not pose a danger or flight risk." *Id.*  In no uncertain terms, the Supreme Court stated that Subsection C "carves out a statutory category of aliens who may *not* be released under [Subsection A]." *Id.* at 837.[13]

Other portions of *Jennings* similarly rest on the understanding that Subsection C applies during the same stages of a case as Subsection A.  The Court explained that "together with [Subsection A], [Subsection C] makes clear that detention of aliens within its scope *must* continue 'pending a decision on whether the alien is to be removed from the United States.'" *Id.* at 846 (citing § 1226(a)).  And again, the Supreme Court applied the timeframe language in Subsection A to define the length of the Government's detention authority under Subsection C: "[Subsection C]

---

[13] Since *Jennings*, the Supreme Court has confirmed that Subsection C is a limited exception to Subsection A.  *Nielsen v. Preap* explained that Subsection A "creates authority for *anyone's* arrest or release under § 1226—and it gives the Secretary broad discretion as to both actions—while [Subsection C]'s job is to *subtract* some of that discretion when it comes to the arrest and release of criminal aliens."  139 S. Ct. 954, 966 (2019).

mandates detention 'pending a decision on whether the alien is to be removed from the United States,' § 1226(a), and it expressly prohibits release from that detention except for narrow, witness-protection purposes." *Id.*

The district court in this case concluded that *Jennings* and *Casas-Castrillon* are reconcilable because "[o]ne could reasonably interpret the language 'together with [Subsection A] . . .' to mean that the two statutory sections work together to ensure that a noncitizen remains in custody pending judicial review of a final order of removal." *Hernandez Avilez v. Barr*, No. 19-CV-08296-CRB, 2020 WL 1704456, at *3 (N.D. Cal. Apr. 8, 2020). In other words, the district court read *Jennings*'s "together with" language to mean that Subsections A and C tag-team to ensure that a noncitizen *can* be held in custody pending judicial review of a final order of removal. On this interpretation, Subsection C "applies before the order of removal becomes final," mandating detention during proceedings before the agency, "and [Subsection A] applies after the order of removal becomes final," *id.*, allowing, but not mandating, detention during litigation of a petition for review in the federal Courts of Appeals. We do not agree that *Jennings* can plausibly be so interpreted. Rather, *Jennings* makes clear that Subsection A and Subsection C alike—that is, each one, not in tandem—authorize detention "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a).

*Jennings*, therefore, is clearly irreconcilable with *Casas-Castrillon*'s conclusion that a Subsection C detainee who pursues judicial review of an order of removal is detained first under Subsection C and later under Subsection A. We hold that *Jennings* abrogates this portion of our decision in *Casas-Castrillon*.

**C.**

*Jennings*'s holding that Subsection A and Subsection C govern during the same time period does not tell us what the time period is.  Subsection A tells us that the Government has the authority to detain noncitizens "pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a).  *Jennings* tells us that Subsection C authorizes detention during the same period as Subsection A but does not define that period.  To be sure, *Jennings* tells us that the Government's authority under both Subsections has a "definite termination point" and ends at "the conclusion of removal proceedings."  *Jennings*, 138 S. Ct. at 846.  But *Jennings* did not address when, for purposes of Subsection A and C, removal proceedings end.  Thus, *Jennings* is silent as to whether the relevant time period includes only the administrative phase of removal proceedings, terminating when the BIA dismisses an appeal from an order of removal, or also encompasses the period of judicial review before a federal Court of Appeals.

Although *Jennings* did not grapple with this question, we did in *Prieto-Romero*.  As we have explained, *Prieto-Romero* held that detention authority under Subsection A continues through judicial review because it "is reasonable to consider the judicial review of a removal order as part of the process of making the ultimate 'decision' as to whether an alien 'is to be removed.'"  534 F.3d at 1062.[14]

Although *Prieto-Romero* was focused on Subsection A, we know after *Jennings* that the time period defined by

---

[14] *Casas-Castrillon* shared this understanding of Subsection A, and it relied on that language from *Prieto-Romero* in explaining the shift in detention authority from Subsection C to A.  535 F.3d at 948.

Subsection A—"pending a decision on whether the alien is to be removed from the United States"—applies to Subsection C as well. Accordingly, in light of *Prieto-Romero*, we hold that the Government's authority to detain a noncitizen under Subsection C likewise applies during the administrative and judicial phases of removal proceedings. To the extent *Casas-Castrillon* held otherwise, *see* 535 F.3d at 948 (holding that the Government's authority to detain a noncitizen under Subsection C ends "upon the dismissal of the alien's appeal by the BIA"), it no longer is good law.

In sum, *Jennings*'s holding that Subsection C's temporal scope is defined by Subsection A and *Prieto-Romero*'s holding that Subsection A applies throughout the administrative and judicial phases of removal proceedings together compel us to conclude that Subsection C applies throughout the administrative and judicial phases of removal proceedings as well. Consequently, noncitizens subject to mandatory detention under Subsection C are not statutorily eligible for release on bond during the judicial phase of the proceedings, except under the narrow circumstances defined by § 1226(c)(2).

We recognize that there are reasons to doubt whether Subsection C does extend to the judicial phase of removal proceedings. First, in *Demore v. Kim*, the Supreme Court rejected a due process challenge to mandatory detention under Subsection C on the ground that the detention authorized by Subsection C is relatively short-lived. 538 U.S. at 529. In making this point, the Court plainly assumed that detention under Subsection C applies solely to the *administrative* phase of removal proceedings. Citing statistics relating to the length of administrative removal proceedings, the Court wrote:

Under [Subsection C], not only does detention have a definite termination point, in the majority of cases it lasts for less than the 90 days we considered presumptively valid in *Zadvydas*. The Executive Office for Immigration Review has calculated that, in *85% of the cases* in which aliens are detained pursuant to [Subsection C], removal proceedings are completed in an average time of 47 days and a median of 30 days. *In the remaining 15% of cases, in which the alien appeals the decision of the Immigration Judge to the Board of Immigration Appeals*, appeal takes an average of four months, with a median time that is slightly shorter.

. . . In sum, the detention at stake under [Subsection C] lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal [to the BIA].

*Id.* at 529–30 (emphasis added) (footnotes and citations omitted).[15] The Court, in other words, assumed that a

---

[15] The federal Government subsequently disclosed that the statistics it provided in *Demore* regarding the typical length of detention were erroneous. *See* Letter from Ian Heath Gershengorn, Acting Solicitor General, U.S. Dep't of Just. Office of the Solicitor General, to Hon. Scott S. Harris, Clerk, Supreme Court of the United States (Aug. 26, 2016), *available at* https://trac.syr.edu/immigration/reports/580/include/01-1491%20-%20Demore%20Letter%20-%20Signed%20Complete.pdf. The quoted passage from *Demore* is relevant here not for the accuracy of its statistics, but because the Court's reasoning regarding those

decision by the BIA would mark the upper limit of Subsection C detention.

Second, in *Jennings* the Supreme Court cited and discussed the foregoing passage in *Demore*. *Jennings* said:

> [Subsection C] is not "silent" as to the length of detention.  It mandates detention "pending a decision on whether the alien is to be removed from the United States," § 1226(a) .
> . . .
>
> . . . In *Demore v. Kim*, 538 U.S., at 529, we distinguished [Subsection C] from the statutory provision in *Zadvydas* by pointing out that detention under [Subsection C] has "a definite termination point": the conclusion of removal proceedings.  As we made clear there, that "definite termination point"—and not some arbitrary time limit devised by courts—marks the end of the Government's detention authority under [Subsection C].

138 S. Ct. at 846.  Thus, *Jennings* referred to *Demore*'s understanding as to the scope of Subsection C detention authority, and *Demore* assumed that the Government's authority under Subsection C extended up to, but not beyond, the administrative phase of removal proceedings.

*Jennings* did not, however, specifically note or adopt *Demore*'s assumption as to the limited coverage of Subsection C.  And the class representative in *Jennings* filed

---

statistics reveal which events it held triggered the end of Subsection C's detention authority.

his habeas petition seeking a bond hearing while litigating his petition for review before this circuit. The class, the Government, and the Court all seem to have assumed during the *Jennings* litigation that Subsection C authorizes detention until a Court of Appeals reaches a decision. *See id.* at 839 (noting that the class at issue involved noncitizens—including those detained under Subsection C—"detained for longer than six months . . . pending completion of removal proceedings, including judicial review").

Given the ambiguity in *Jennings* as to the length of § 1226's detention authority, we are not free to disregard *Prieto-Romero*'s quite explicit holding that Subsection A ends with the end of judicial review. Under our precedent, we are bound by our prior decisions unless a "relevant court of last resort [has] undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller*, 335 F.3d at 900. That standard is not satisfied here. *Jennings* did not squarely address when detention under Subsection A, and so under Subsection C, ends. Its general reference to *Demore*, which itself is not explicit on this point, cannot fill that gap. *Jennings*, therefore, is not clearly irreconcilable with *Prieto-Romero*'s interpretation of the relevant statutory language defining the endpoint of Subsection A, and, after *Jennings*, Subsection C.

Setting aside *Prieto-Romero*, moreover, could leave a gaping hole in the statutory scheme. If detention under Subsection C ends when the BIA issues its decision, detention under Subsection A is coextensive with Subsection C (as *Jennings* tells us), and detention under Section 1231(a) begins only after judicial review, then there would be no authority to detain any noncitizens—whether with a criminal

record or not—under Section 1231 during the judicial phase of removal proceedings.**[16]**

To conclude, under *Jennings*, Subsection A and Subsection C alike authorize detention "pending a decision on whether the alien is to be removed from the United Sates." 8 U.S.C. § 1226(a); *Jennings*, 138 S. Ct. at 846. To the extent *Casas-Castrillon* holds otherwise, it is no longer good law. Under *Prieto-Romero*, the statutory phrase "pending a decision on whether the alien is to be removed from the United States," 8 U.S.C. § 1226(a), encompasses "the judicial review of a removal order," 534 F.3d at 1062. Thus, under *Prieto-Romero*, Subsection C authorizes detention during the judicial review phase of removal proceedings. Although that conclusion is in some tension with *Demore*, 538 U.S. at 529–30, which *Jennings* in part relied upon, 138 S. Ct. at 846, neither *Demore* nor *Jennings* squarely addressed the meaning of the statutory phrase "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Accordingly, under *Miller v. Gammie*, 335 F.3d at 900, *Prieto-Romero* remains good law on this point.

We follow *Jennings* and *Prieto-Romero* and hold that Subsection C authorizes detention during the judicial review phase of removal proceedings. Because Hernandez Avilez was detained under Subsection C, she was not entitled to a *Casas-Castrillon* bond hearing under Subsection A.

---

[16] The issue presented to this court on appeal by the Government as appellant was limited to whether Subsection A or Subsection C of Section 1226 applies during this time period. Neither party raised any argument that Section 1231(a) applies, whether because the stay in this case was a temporary stay, or for any other reason. So we do not consider that possibility.

## III.

Hernandez Avilez argued before the district court that even if her detention was governed by Subsection C, she was entitled to habeas relief as a matter of due process. The district court declined to reach this argument, and we make no determination regarding the issue here. We leave this question to the district court to decide in the first instance.

The district court's order granting Hernandez Avilez habeas relief and ordering the Government to provide her with a bond hearing under *Casas-Castrillon* is **VACATED.** This case is **REMANDED** to the district court for consideration of Hernandez Avilez's due process claim. Hernandez Avilez's motion to take judicial notice is **GRANTED**. Dkt. No. 42. Each side shall bear its own costs of appeal.

---

BERZON, Circuit Judge, concurring:

I concur in the principal opinion. I write separately to express my disquiet with the partial abrogation *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc), has compelled today, and to urge my colleagues to consider rehearing this case en banc.

As noted in the principal opinion, *Prieto-Romero v. Clark*, 534 F.3d 1053 (9th Cir. 2008), and *Casas-Castrillon v. Department of Homeland Security*, 535 F.3d 942 (9th Cir. 2008), were decided by the same panel on the same day. The cases were of a piece, laying out a cohesive interpretation of 8 U.S.C. §§ 1226(a) and (c). Specifically, *Casas-Castrillon* held that upon a decision by the BIA, the Attorney General's

detention authority shifted *from* § 1226(c) ("Subsection C") *to* § 1226(a) ("Subsection A"). *See* 535 F.3d at 948. *Prieto-Romero* held that detention authority under Subsection A continued through the end of judicial review. *See* 534 F.3d at 1062. *Prieto-Romero*'s holding made *Casas-Castrillon*'s "shift" possible; *Casas-Castrillon* cited the relevant language from *Prieto-Romero* to explain its holding. *See Casas-Castrillon*, 535 F.3d at 948.

Since then, the Supreme Court has interpreted Subsections A and C as temporally coextensive. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 847 (2018); *Nielsen v. Preap*, 139 S. Ct. 954, 959–60, 966–67 (2019). Whatever event marks "a decision on whether the alien is to be removed," the temporal limit specified in Subsection A, that event marks the end of detention authority for noncitizens detained under Subsection C, too. So the "shift" in detention authority *Casas-Castrillon* described has been abrogated.

The question remains, as the principal opinion notes, what marks that endpoint? The Supreme Court has not squarely considered the question. We have, at least regarding Subsection A. So, under *Miller v. Gammie* we are bound by our partial answer in *Prieto-Romero*: detention authority for Subsection A continues through the end of judicial review. 534 F.3d at 1062. The *Prieto-Romero* panel, of course, never contemplated that its holding regarding Subsection A's temporal reach would apply to Subsection C. To the contrary, it expected it would not, as *Casas-Castrillon* supplied a different endpoint.

The result of today's holding is to save fragments of two opinions that were cohesively crafted, to fashion an entirely new interpretation of the statutory scheme that technically holds together—it survives intervening Supreme Court

authority and preserves Ninth Circuit authority—but diverges dramatically from this Court's original interpretation. Rehearing this case en banc would allow the Court to consider the interdependent holdings of *Prieto-Romero* and *Casas-Castrillon* anew in light of *Jennings* and *Nielsen* to reach an interpretation that coheres. Sitting en banc, we could consider whether the shared endpoint for Subsection A and Subsection C is the end of administrative proceedings, not the end of judicial review.

That inquiry would invite full consideration of the statutory text and purpose, an exploration currently off limits because of *Prieto-Romero*. Such exploration might reveal, for example, that in other parts of the Immigration and Nationality Act ("INA"), Congress expressly specified when it intended a period of time to include judicial review. *See, e.g.*, 8 U.S.C. § 1255(e)(2) ("The period described in this paragraph is the period during which *administrative or judicial proceedings are pending* regarding the alien's right to be admitted or remain in the United States.") (emphasis added); *id.* § 1252(b)(3)(B) ("Service of the petition on the officer or employee does not stay the removal of an alien *pending the court's decision* on the petition, unless the court orders otherwise.") (emphasis added).

The inquiry would also allow deeper consideration of the Supreme Court's understanding of the temporal endpoint of Subsection A and Subsection C. As the principal opinion today illustrates, interpreting the shared endpoint as the end of administrative review finds support in *Demore v. Kim*, 538 U.S. 510 (2003). *See* Principal Opinion 26–29. *Demore* considered the complete set of "cases in which aliens are detained pursuant to § 1226(c)," and noted that in 85% of them, removal proceedings were completed in an average time of 47 days, whereas "[i]n the remaining 15% of cases,

*in which the alien appeals the decision of the Immigration Judge to the Board of Immigration Appeals*," removal proceedings took an average of four months. *Demore*, 538 U.S. at 529. In other words, in 100% of cases, "removal proceedings" were deemed concluded with the end of administrative, not judicial, proceedings.[1]

A later communication from the Solicitor General's Office to the Supreme Court confirms that the executive branch also understood Subsection C to authorize detention only through administrative proceedings. In August 2016, while *Jennings* was pending before the Court, the Acting Solicitor General sent a letter to the Clerk of the Court acknowledging "significant errors" and the exclusion of "more than 15,000 cases that should have been counted" in the data it had presented to the Court in *Demore*.[2] The Solicitor General's letter enclosed an analysis from the

---

[1] To the extent Judge Bea's concurrence suggests otherwise, it misreads *Demore*. *Demore* notes that these statistics do not "include 'the many cases in which removal proceedings are completed while the alien is still serving time for the underlying conviction.'" Bea Concurrence 38-39 (quoting *Demore*, 538 U.S. at 529). But *Demore* invokes that separate category of noncitizens to show prolonged detention under Subsection C is *not* at issue for those individuals because they "are never subjected to mandatory detention at all." 538 U.S. at 530. Any suggestion that this separate category is part of the set of individuals detained under Subsection C, all of whose detention ended with a BIA decision, is undercut by *Demore*'s description of those individuals as *not* subject to Subsection C's mandatory detention, and by *Demore*'s prior express consideration of 100% of cases subject to Subsection C.

[2] *See* Letter from Ian Heath Gershengorn, Acting Solicitor General, to Hon. Scott S. Harris, Clerk, Supreme Court of the United States 2 (Aug. 26, 2016), *Demore v. Kim*, 538 U.S. 510 (2003) (No. 01-1491) ("Gershengorn Letter"), *available at* https://trac.syr.edu/immigration/re ports/580/include/01-1491%20-%20Demore%20Letter%20-%20Signe d%20Complete.pdf.

Executive Office of Immigration Review detailing the miscalculations and stating: "Please note that the length of appeal time measures the time between when a party files a notice of appeal with the Board of Immigration Appeals (BIA) and *when the BIA renders a decision on that appeal.*"[3]

As the principal opinion notes, though, this interpretation of Subsection C creates an apparent problem: it could "leave a gaping hole in the statutory scheme" between when § 1226 authority ends and 8 U.S.C. § 1231 authority begins. *See* Principal Opinion 29. Specifically, the Attorney General could lack statutory authority under either provision to detain a noncitizen while the court of appeals considered a petition for review.

Such an apparent gap in detention authority is indeed perplexing. But a review of Congress's overhaul of the INA in 1996 reveals that Congress may have envisioned a removal system in which there was no need for such detention. First, Congress changed the INA to authorize the removal of noncitizens immediately upon a BIA decision, newly allowing a removed noncitizen to file and litigate a petition for review from outside the United States. Second, Congress expressly directed the executive branch to finish removal proceedings against noncitizens with criminal records before their period of *criminal* detention concluded, enabling the removal of those individuals immediately upon release from criminal detention and reducing the need for civil detention authority under Subsection C at all, let alone beyond the period of administrative review.

---

[3] *See* Gershengorn Letter, Enclosure (Letter from Jean C. King, General Counsel, Executive Office of Immigration Review, to Ian Heath Gershengorn, Acting Solicitor General 2 (Aug. 25, 2006)) (emphasis added).

More specifically: Before 1996, "courts of appeals lacked jurisdiction to review the deportation order of an alien who had already left the United States," and most aliens were entitled to "an automatic stay of their removal order while judicial review was pending." *Nken v. Holder*, 556 U.S. 418, 424 (2009) (citing 8 U.S.C. §§ 1105a(c), 1105a(a)(3) (1994 ed.)). With the passage of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996, Congress decided "to allow continued prosecution of a petition [for review] after removal," and so repealed the statutory provision that had automatically stayed orders of removal while a noncitizen pursued a petition for review. *Id.* at 435. Thus, after IIRIRA, removed noncitizens can "pursue their petitions for review" from the country to which they were removed, and if they prevail they "can be afforded effective relief by facilitation of their return." *Id.* Congress thus expected that after IIRIRA, a large portion of noncitizens would be removed upon the BIA's denial of an appeal, eliminating the need for detention authority except during the "removal period" § 1231 covers, that is, after a noncitizen's removal order is final.  8 U.S.C. § 1231(a)(1)(B).

Additionally, Congress sought dramatically to reduce the number of noncitizens detained under Subsection C. Congress "directed the INS to identify and track deportable criminal aliens while they are still in the criminal justice system." *Demore*, 538 U.S. at 530 n.13 (citing IIRIRA and the Antiterrorism and Effective Death Penalty Act of 1996). The goal was to "complete removal proceedings against *all* deportable criminal aliens before their release." *Id.* These efforts worked: one year after IIRIRA's passage, removal proceedings had been completed for "nearly half of all deportable criminal aliens" before their release from prison.

*Id.* Those individuals were "never subjected to mandatory [civil] detention at all." *Id.* at 530. Congress intended to reduce to zero the population of noncitizens with criminal records whose removal proceedings continued beyond the period of their *criminal* detention. Congress therefore would have seen little need to provide continued *civil* detention authority for such individuals. As *Demore* noted, if the government achieved its goal, "§ 1226(c) and the temporary detention it mandates would be rendered obsolete." *Id.* at 530 n.13. All told, the lack of detention authority the posited interpretation creates can be explained by provisions in IIRIRA and the executive actions that followed.

Perhaps the court would not arrive at this interpretation on en banc review. But we should take the opportunity capaciously to consider all of § 1226 in light of *Jennings* by revisiting *Prieto-Romero* and *Casas-Castrillon* in their entirety. I join the principal opinion today because I believe it a proper application of *Miller v. Gammie* to this unusual interaction between our precedents and a new Supreme Court precedent. But the result is to discard a chunk of two interdependent holdings and leave this Circuit with the partial remains. Perhaps we can do better sitting en banc.

BEA, Circuit Judge, concurring:

I concur in the principal opinion, with the following two exceptions.  First, for the reasons explained below, I do not believe there is any meaningful "tension" between the holdings of *Demore v. Kim,* 538 U.S. 510 (2003), *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), and *Prieto-Romero v. Clark*, 534 F.3d 1053 (9th Cir. 2008), with respect to the meaning of "pending a decision on whether the alien is to be removed from the United States," 8 U.S.C. § 1226(a). Second, I reject the principal opinion's characterization of Petitioner as a "noncitizen."  Petitioner is indeed a citizen— of Mexico.   And here, under 8 U.S.C. § 1101(a)(3), Petitioner is described in the statutes applicable to this case as an *alien*.  Federal courts applying federal immigration laws should not invent their own terminology to stand in place of definitions used in the congressional statutes they are tasked with applying.

1. In contrast to the principal opinion's characterization, *Demore* did not "plainly assume" that detention authority under § 1226(c) extended only to the administrative phase of removal proceedings, and *Jennings* did not further endorse this (alleged) understanding of § 1226(c).  Principal Op. at 26–29.

In remarking on certain statistics provided by the Executive Office for Immigration Review (EOIR), *Demore* was in no way attempting to set the metes and bounds of the Government's detention authority under § 1226(c).  Instead, the Court was simply commenting on the general experience of aliens challenging their detention under § 1226(c). Indeed, *Demore* itself noted that the referenced EOIR statistics were incomplete, in that they did not include "the many cases in which removal proceedings are completed

while the alien is still serving time for the underlying conviction." *Demore*, 538 U.S. at 529.[1]  More important still, *Demore* offered the following observation concerning the tradeoffs an alien faces when contemplating a challenge to a removal order:

> Prior to the enactment of § 1226(c), when the vast majority of deportable criminal aliens were not detained during their deportation proceedings, many filed frivolous appeals in order to delay their deportation.  See S. Rep. 104–48, at 2 ("Delays can earn criminal aliens more than work permits and wages— if they delay long enough they may even obtain U.S. citizenship").  *Cf. Zadvydas,* 533 U.S., at 713, (KENNEDY, J., dissenting) ("[C]ourt ordered release cannot help but encourage dilatory and obstructive tactics by aliens").  **Respondent contends that the length of detention required to appeal may deter aliens from exercising their right to do so.**  Brief for Respondent 32.  **As we have explained before, however, "the legal system ... is replete with situations requiring the making of difficult judgments as to which course to follow," and, even in the criminal context, there is**

---

[1] To the extent Judge Berzon's concurrence suggests my concurrence misreads *Demore*, it misreads my concurrence.  My point in highlighting *Demore*'s characterization of the EOIR statistics is to show how thin a reed it is to suggest that *Demore* explicitly considered "100% of cases subject to Subsection C" solely by way of *Demore*'s discussion of those cursory statistics.  Judge Berzon Concurrence at 34 n.1.

> **no constitutional prohibition against requiring parties to make such choices.** *McGautha v. California,* 402 U.S. 183, 213 (1971) (internal quotation marks omitted); *accord*, *Chaffin v. Stynchcombe,* 412 U.S. 17, 30–31 (1973).

*Demore*, 538 U.S. at 530 n.14 (**emphases added**). *Demore* recognized that the longer an alien wishes to challenge his removal order, the longer he will be detained under § 1226(c). *Demore* in no way "plainly assumed" that detention authority under § 1226(c) extended only to the administrative phase of removal proceedings.

Consider the alternative. While I generally do not find legislative history persuasive, *Demore* went out of its way to explain that § 1226(c) was adopted "against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens." *Demore*, 538 U.S. at 518. *Demore* noted that Congress "had before it evidence that one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's **failure to detain those aliens during their deportation proceedings**." *Id.* at 519 (**emphasis added**). *Demore* cited as a key animating factor behind Congress' enactment of § 1226(c) that "one out of four criminal aliens released on bond absconded prior to the completion of his removal proceedings." *Demore*, 538 U.S. at 520. Finally, *Demore* observed as follows:

> During the same period in which Congress was making incremental changes to the immigration laws, it was also considering wholesale reform of those laws. **Some studies presented to Congress suggested**

> **that detention of criminal aliens during their removal proceedings might be the best way to ensure their successful removal from this country.** *See*, *e.g.,* 1989 House Hearing 75; Inspection Report, App. 46; S. Rep. 104–48, at 32 ("Congress should consider requiring that all aggravated felons be detained pending deportation. Such a step may be necessary because of the high rate of no-shows for those criminal aliens released on bond"). **It was following those Reports that Congress enacted 8 U.S.C. § 1226, requiring the Attorney General to detain a subset of deportable criminal aliens pending a determination of their removability.**

*Demore*, 538 U.S. at 521 (**emphases added**). Reading *Demore* as suggesting that § 1226(c) permits detention only through the completion of agency proceedings would be to turn on its head *Demore*'s discussion of the failures Congress was remedying by enacting § 1226(c). Moreover, imagine the situation if *Demore* is read in that manner: after the Government has invested substantial resources in procuring a removal order of a criminal alien, at the very height of the Government's interest in removing the alien, detention authority under § 1226(c) would end, with the alien being released pending judicial review. Nothing in *Demore* supports this reading of § 1226(c).

For its part, *Jennings* says nothing about what "pending a decision on whether the alien is to be removed from the United States" actually means. *Jennings* simply referred back to *Demore* for the proposition that detention authority

under § 1226(c) is *finite*, extending only until "a decision on whether the alien is to be removed from the United States" is actually made:

> In *Demore v. Kim*, 538 U.S. at 529, we distinguished § 1226(c) from the statutory provision in *Zadvydas* [8 U.S.C. § 1231(a)(6)] by pointing out that detention under § 1226(c) has "a definite termination point": the conclusion of removal proceedings. As we made clear there, that "definite termination point"—and not some arbitrary time limit devised by courts—marks the end of the Government's detention authority under § 1226(c).

*Jennings*, 138 S. Ct. at 846. Holding that "the conclusion of removal proceedings" includes judicial review is as much a "definite termination point" as would be to hold that "the conclusion of removal proceedings" refers solely to agency proceedings—either definition is equally "definite" in providing a termination point.

Thus, nothing in *Jennings* forecloses *Prieto-Romero*'s holding that construes "the conclusion of removal proceedings" as encompassing judicial review. And for all the reasons highlighted above, *Demore* is entirely consistent with this reading of § 1226(c) as permitting detention of certain criminal aliens through judicial review. There is simply no tension between *Demore*, *Jennings*, and *Prieto-Romero*.

2. It is an unfortunate trend in the caselaw that certain words and expressions are gaining continued acceptance to stand in place of terms and definitions put forth in binding

statutes.  In this regard, the non-statutory word "noncitizen" has attained a certain prominence throughout the federal judiciary.  *See, e.g.*, *Patel v. Garland*, 142 S. Ct. 1614, 1618–19 (2022).  Of course, the term is textually inaccurate as applied to the petitioner in this case, who is a citizen of Mexico.  Indeed, most of the petitioners appearing before this Circuit are citizens of one country or another.

Defenders of "noncitizen" sometimes claim that this word is interchangeable with alien because everyone is a citizen of somewhere, sans the unusual case of the individual who has somehow been rendered stateless.  This contention is not an accurate excuse.  For one, monarchies exist.  A Spanish born person is a "subject" of the Kingdom of Spain, albeit he may have democratic rights.  One born in Saudi Arabia is similarly a "subject" of the House of Saud.  Even more, a person born in American Samoa or Swains Island is a U.S. national, but not a citizen; he or she cannot vote in federal elections nor hold federal office.[2]

These distinctions matter.  Words matter.  Our federal immigration statutes concern themselves with aliens.  This word "alien" is not a pejorative nor an insult.  I certainly did not consider it an insult to be referred to as an alien in my deportation proceedings.  Nor is the use of the term "alien" wholly untethered from its judicial context that it permits being construed in the manner the principal opinion suggests.  Principal Op. at 8 n.1.  Alien is a statutory word defining a specific class of individuals.  And when used in its statutory context, it admits of its statutory definition, not

---

[2] *See, e.g.*, *U.S. Citizen Vs U.S. National: Differences*, US Immigration, https://www.usimmigration.org/articles/u-s-citizen-vs-u-s-national-what-is-the-difference (last visited August 23, 2022).

those definitions with negative connotations that can be plucked at will from the dictionary.

I must note that the judiciary's embrace of "noncitizen" also comes at a real cost to litigants, who are now forced to make a lose-lose choice.  On the one hand, a litigant could decide to use the statutory term "alien" in his briefing before the court, which risks offending devotees to "noncitizen." On the other hand, a litigant could decide to use the non-statutory term "noncitizen" in his briefing before the court, at the risk of showing a disdain for statutory definitions. Sadly, this quandary is laid bare by the principal opinion's express association of the statutory term "alien" with the label "offensive."  Principal Op. at 8 n.1.  By intimating that "alien" in its statutory context has this meaning, the majority has substantiated the concern that a contingent of judges will respond negatively to the term, even though its neutral, statutory definition governs this case.   This situation is entirely unnecessary, and I hope my colleagues throughout the judiciary can be persuaded to dispense with such rhetoric altogether.

Perhaps one day the federal statutes will be changed to reference only "noncitizens."[3]  And if that day comes, our decisions will respond accordingly to such changes.  But until then, I respectfully suggest my colleagues hew closely to the laws as they are written, both in form and in substance.

---

[3] Indeed, this much has already happened in connection with certain laws of the state of California.  *See, e.g.*, The Associated Press, *California Gov. Newsom signs law to replace term 'alien' with 'noncitizen' or 'immigrant'*, NBC News (Sept. 25, 2021), https://www.nbcnews.com/news/us-news/california-gov-newsom-signs-law-replace-term-alien-noncitizen-or-n1280095.